**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **SUSAN WOODARD,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **Civil Action No. 7:04-CV-0139-BH** |
| **v.** | § | |
| | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court are *Plaintiff's Motion for Summary Judgment*, filed January 5, 2005; *Commissioner's Cross-Motion for Summary Judgment*, filed February 4, 2005; and *Plaintiff's Reply Brief*, filed April 6, 2005. Having reviewed the evidence of the parties in connection with the pleadings, the Court concludes that *Plaintiff's Motion for Summary Judgment* should be **GRANTED,** *Commissioner's Cross-Motion for Summary Judgment* should be **DENIED**, and the decision of the Commissioner should be **REVERSED** and **REMANDED** for reconsideration.

## I.  BACKGROUND[1]

*A.     Procedural History*

Suzan Woodard ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title XVI of the Social Security Act. On November 19, 2000, Plaintiff filed an application for disability

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

1

benefits.[2]  (Tr. at 24).  Plaintiff claimed she was disabled due to major depression, panic disorder, and agoraphobia.  (Tr. at 82).  Plaintiff's application was denied initially and upon reconsideration.  (Tr. at 33-45).  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 46).  A hearing, at which Plaintiff personally appeared and testified, was held on January 15, 2004. (Tr. at 277-316).  On February 19, 2004, the ALJ issued his decision finding Plaintiff not disabled.  (Tr. at 15-22).  The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision.  (Tr. at 2-4).  Thus, the ALJ's decision became the final decision of the Commissioner on June 3, 2004.  (Tr. at 2-4).  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on July 21, 2004.

**B.**     ***Factual History***

   **1.**     <u>**Age, Education, and Work Experience**</u>

   Plaintiff was born on October 20, 1962. (Tr. at 23).  At the time of the hearing before the ALJ she was 41 years old.  (Tr. at 282).  She went to high school through ninth grade and obtained a GED.  *Id.*  She also received training as a medical assistant.  (Tr. at 88).  Her past relevant work experience includes work as a motel and apartment housekeeper, a janitor, and a motel laundry worker.  (Tr. at 313).  Plaintiff last worked in June 2001.  (Tr. at 286).

---

[2]Plaintiff previously filed an application for disability benefits on May 17, 2000, claiming she was disabled due to bilateral patella femoral syndrome, chest pain, depression, stomach pain, and carpal tunnel syndrome.  The application was denied based on the determination that Plaintiff did not suffer from a medical condition that limited her ability to work.  This prior denial was not appealed.

2.    **Medical Evidence**

Plaintiff has a history of anxiety and panic attacks since 1999.  (Tr. at 127).  On June 21,

2001, Plaintiff was admitted to the emergency room at Charlton Methodist Hospital in Dallas, Texas

with a panic attack.  *Id.*  She had been driving on the freeway when the attack occurred and was

taken via ambulance to the emergency room.  *Id.*  Her symptoms were abrupt and included throat

tightening, chest tightness, and bilateral finger numbness.  *Id.*  The episode lasted approximately

thirty minutes.  *Id.*  Plaintiff reported that she had similar symptoms previously and that her panic

episodes occurred every three to four days.  *Id.*  Plaintiff also reported that she had not been able to

keep a job as a result of the attacks.  *Id.*  The emergency room doctor diagnosed the episode as a

panic attack with angina.  Upon discharge, Plaintiff was advised to call the Tarrant County Health

Department for referral to a mental health clinic. (Tr. at 128, 130).

Plaintiff was treated at Mental Health Mental Retardation of Tarrant County ("MHMR")

from July 19, 2001, to January 16, 2002.  (Tr. at134-62).  Plaintiff complained of anxiety,

depression, irritability, lack of sleep, loss of appetite, and decrease in energy.  (Tr. at 134).  On July

19, 2001 a mental health clinician entered the following diagnoses:

|         |                                                              |
|---------|--------------------------------------------------------------|
| Axis I:   | Major depression, recurrent, severe, without psychosis<br>Anxiety disorder |
| Axis II:  | Personality disorder not otherwise specified                 |
| Axis III: | Ulcers<br>Asthma                                             |
| Axis V:   | Global Assessment of Functioning ("GAF") of 50[3]            |

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Function Scale is used to report the clinician's judgment of the individual's overall level of functioning.  GAF scores of 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends,

(Tr. at 154).  Plaintiff's August 18, 2001 lab results from MHMR tested positive for cannabis.  (Tr.

at 148).

On February 11, 2002, Dr. Tara Reddy performed a psychiatric evaluation of Plaintiff.  (Tr.

at 163).  Dr. Reddy made the following diagnoses:

| | |
|---|---|
| Axis I: | Major depression, recurrent, moderate as manifested by crying episodes, impaired sleep, appetite disturbance, anergia, social isolation, decreased libido, helplessness, hopelessness, as well as anhedonia |
| | Panic disorder with agoraphobia - The patient feels like she is going to have a heart attack, her heart races, she experiences chest pain, becomes breathless, reports perspiration, tremors and basically she avoids crowds and shopping |
| Axis II: | None |
| Axis III: | Right carpal tunnel syndrome<br>Bilateral knee pain |
| Axis IV: | Psychosocial problems<br>Economic problems<br>Employment problems |
| Axis V: | Current GAF of around 55<br>Prior GAF of around 70 |

(Tr. at 164-65).

Dr. Richard Alexander and Dr. A. Boulos, non-examining agency physicians, reviewed

Plaintiff's medical file and conducted a residual functional capacity assessment.  (Tr. at 167-69).

On January 28, 2002, the physicians concluded that Plaintiff had mild restriction of activities of

_____

unable to keep a job).  GAF scores of 51-60 indicate moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (citations omitted).

daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 181). The physicians also concluded that Plaintiff retained the abilities to understand and carry out simple instructions, to interact with coworkers and supervisors, and to adapt to routine changes in the work setting. *Id.* From these findings the physicians concluded that Plaintiff's alleged limitations due to mental symptoms were not fully supported by the record. (Tr. at 183).

Dr. Mahmood Panjwani, a consulting physician, examined Plaintiff on March 23, 2002. (Tr. at 185). Dr. Panjwani's impression was that Plaintiff had right wrist pain from a previous surgery for carpal tunnel syndrome which was improved, but Plaintiff was still symptomatic. (Tr. at 189). Dr. Panjwani thought that this right wrist pain made Plaintiff unable to perform prior activities such as housekeeping work. *Id.* Also, it was Dr. Panjwani's impression that Plaintiff had knee pain, diagnosed as chondromalacia, and anxiety, panic attacks/depression. *Id.*

Plaintiff's medical file was reviewed by a medical consultant, Dr. Paul Sundin, on April 16, 2002. (Tr. at 193-200). First, Dr. Sundin evaluated Plaintiff's exertional limitations and concluded that she could occasionally lift and/or carry (including upward pulling) 50 pounds, frequently lift and/or carry (including upward pulling) 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull (including operation of hand and/or foot controls). (Tr. at 194). Second, Dr. Sundin evaluated Plaintiff's postural limitations and concluded that she was limited in climbing ladders, ropes, and scaffolds, and occasionally limited in balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs. (Tr. at 195). Third, Dr. Sundin evaluated Plaintiff's manipulative limitations and concluded that she had

occasional handling and fingering limitations when using her right hand. (Tr. at 196). Fourth, Dr. Sundin evaluated Plaintiff's visual limitations and concluded that she had none. *Id.* Fifth, Dr. Sundin evaluated Plaintiff's communicative limitations and concluded that she had none. (Tr. at 197). Finally, Dr. Sundin evaluated Plaintiff's environmental limitations and concluded that she should avoid even moderate exposure to vibrations and hazards (machinery, heights, etc.). *Id.* Dr. Sundin's report ultimately concluded that Plaintiff's alleged limitations were not fully supported by the medical evidence. (Tr. at 198).

Plaintiff was treated at John Peter Smith Hospital in Fort Worth, Texas from May 29, 2002 to June 13, 2002. (Tr. 201-10). She complained of pain related to carpal tunnel syndrome and bilateral knee joint pain. (Tr. 209). A doctor at the hospital diagnosed her as having knee pain, carpal tunnel, and anxiety among other things. (Tr. 210).

On July 31, 2002, another medical consultant reviewed Plaintiff's medical records and made similar conclusions to Dr. Sundin, with the exception that the consultant believed that Plaintiff had no postural limitations. (Tr. at 211-18).

Plaintiff was treated at East Texas Medical Center for abdominal pain from August 20, 2002 to August 21, 2002. (Tr. at 219-20).

Plaintiff was treated at Family Health Center in Wichita Falls, Texas, beginning November 20, 2002, for knee pain, an ingrown toenail, herpes, hand pain, and abdominal pain. (Tr. at 229-62). On November 20, 2002, Plaintiff complained of feeling stressed out, having a short temper, and having tremors all day, among other things. (Tr. at 250). She also reported having had a recent mammogram and sonogram, but did not know the results. *Id.* Dr. Ravi assessed her as having arthritis and also advised her to release her medical records from the mammogram and sonogram

so that she could be sent for another sonogram if needed.  (Tr. at 249).  During that same visit Dr. Ravi noted Plaintiff's history of depression and panic disorder for which Plaintiff was seeking treatment at MHMR.  *Id.*  On January 31, 2003, Plaintiff was assessed as having contact dermatitis as well as arthritis involving the right knee.  (Tr. at 248).  Dr. Ravi also noted that Plaintiff was scheduled for an appointment with Dr. Myers on February 13, 2003 for an abnormal mammogram. *Id.*  Finally, on February 28, 2003, Plaintiff was assessed as having contact dermatitis, herpes genitalis in the prodromal phase, a history of depression and panic disorder.  (Tr. at 247).  She was also post-menopausal.  *Id.*  Dr. Ravi noted that Plaintiff's depression and panic disorder were being followed up at MHMR.  *Id.*  Plaintiff continued to receive treatment at Family Health Center until August 5, 2003.  *Id.*

During the same time period, from November 11, 2002 to August 27, 2003, Dr. Decena was Plaintiff's psychiatrist at Helen Farabee Regional MHMR Center.  (Tr. at 263-74).  Dr. Decena performed a psychiatric evaluation of Plaintiff on November 21, 2002.  The evaluation indicated that Plaintiff's chief complaint was major depression, occasional panic episodes, nervousness, and snappiness.  (Tr. at 272).  Her psychiatric history included depression beginning in 1997 or 1998 when she was in the process of a divorce.  Id.  However, the history indicated that she was never hospitalized for depression.  *Id.*  Her history also indicated that a year after her depression began, she started to experience panic episodes and needed less sleep.  *Id.*  Dr. Decena made the following diagnoses:

|          |                                                                                  |
|----------|----------------------------------------------------------------------------------|
| Axis I:  | Bipolar I Disorder, most recent episode mixed, severe without psychotic features |
|          | Panic disorder without agoraphobia                                               |
| Axis II: | No diagnosis                                                                      |

| Axis III: | Recurrent headaches |
| | Hypercholesterolemia |

| Axis IV: | Problems related to the social environment |
| | Economic problems |

| Axis V: | GAF Scale = 48 (current); 50 (past year) |

(Tr. at 273).

After the initial evaluation, Plaintiff was seen by Dr. Decena monthly for medication refills and general check ups. (Tr. at 264-71). During each check up, Dr. Decena filled out a progress note which detailed Plaintiff's chief complaints. *Id.* On December 17, 2002, Plaintiff reported that she had not been doing well and was feeling depressed with loss of motivation. (Tr. at 271). She claimed that she had not been sleeping well at night and had been having mood swings. *Id.* She reported shakiness which she claimed was a result of worrying a lot. *Id.* However, Dr. Decena acknowledged that her shakiness had been present before taking any psychoactive medications. *Id.* She denied any adverse or ill effects from all her medication. *Id.* On January 17, 2003, Plaintiff was quite shaky and talking fast. (Tr. at 270). She indicated that she had to stop taking one of her medications because she had been sleeping all the time and could not function. *Id.* On February 20, 2003, Plaintiff reported still feeling depressed with mood swings and feeling sleepy, but was unable to fall asleep at night. *Id.* On March 20, 2003, Plaintiff stated that she still had not been doing well and still having mood swings, but not the dysphoric mania. (Tr. at 268). She also denied adverse effects from her medication. *Id.* Again on April 22, 2003, Plaintiff reported not doing well, still having mood swings, and not sleeping well. (Tr. at 267). The progress note indicated that her symptoms may have been associated with her problems with her ex-husband, with whom she was staying because of financial necessity. *Id.* On May 21, 2003, Plaintiff complained of feeling quite

depressed and not sleeping very well.  (Tr. at 266).  She denied having suicidal ideations and remarked that she continued to receive counseling from two sources.  *Id.*  She identified her living situation with her ex-husband as the most probable cause of her problems.  *Id.*  On July 2, 2003, Dr. Decena noted that Plaintiff was neatly dressed and groomed and had good eye contact, but was quite sullen and indicated that she had not been feeling very well or sleeping very well.  (Tr. at 265).  During that same visit, Plaintiff complained of nightmares, especially after taking Remeron.  *Id.* Also, in spite of her medication, Plaintiff was still experiencing panic episodes.  *Id.*  She also reported being stressed out because her ex-husband had left her and she could only stay in his house until the end of the month.  *Id.*  Plaintiff's last reported progress note was on July 30, 2003.  (Tr. at 264).  During the visit she complained of lack of sleep, nightmares, depression, and generally not feeling very well.  *Id.*  Dr. Decena continued to treat Plaintiff through August 27, 2003.  (Tr. at 263-74.)

While still being treated by Dr. Decena, Plaintiff saw Chuck Staats, LNSW-ACP[4], on a weekly basis beginning on March 14, 2003 for her "debilitating mental illness condition of Bipolar II Disorder, Recurrent Major Depressive Episodes without Hypomanic Episodes and Panic Disorder Without Agoraphobia." (Tr. at 275).  He reported that she was taking a medication regime of Zoloft, Neuronten, Clonazepam, and Remeron which had not produced satisfactory results.  *Id.*  Mr. Staats claimed that Plaintiff was "unable to work to support herself due to her debilitating condition," and desperately needed "financial assistance to survive and have a chance to stabilize her condition medically, mentally, and emotionally[.]"  *Id.*

---

[4]Licensed Master of Social Work - Advanced Clinical Practitioner

9

### 3. <u>**Hearing Testimony**</u>

On January 15, 2004, Plaintiff appeared before the ALJ and was represented by a non-attorney representative. (Tr. at 279). Also present was a vocational expert ("VE"), Clifton A .King, Jr. *Id.* Plaintiff testified that she was 41 years old and had obtained a GED. (Tr. at 282). She also stated that she received further training as a medical assistant. (Tr. at 283). Plaintiff testified that she last worked in June of 2001 as a housekeeper at a Motel 6. (Tr. at 286). She claimed to have stopped working after experiencing a panic attack. *Id.*

Plaintiff claimed that her primary problems were depression, panic disorder, and agoraphobia social disorder. (Tr. at 287). She claimed that her agoraphobia is a fear of leaving her house and the fear of having a panic attack in a public place. *Id.* She believed that these problems were caused by personal problems related to her last divorce. (Tr. at 288.) Plaintiff further testified that she was treated as an outpatient at Charlton Medical Hospital in 2002 after a panic attack that occurred while she was driving. (Tr. at 289.)

When asked about her stomach problems, she claimed that she had experienced ulcers for a long time. (Tr. at 291.) Plaintiff stated that she used to take Prevacid but could no longer afford it. *Id.* When asked about carpal tunnel syndrome, Plaintiff responded that she had carpal tunnel release surgery performed on her right wrist in 1997. *Id.* She also testified to having chest pains during panic attacks, but denied having any heart problems. *Id.*

The ALJ asked if she saw a mental health specialist on a regular basis and Plaintiff responded that she goes to two facilities once a month and attends one-on-one counseling sessions every week. (Tr. at 292.) She testified that the doctors have told her she has panic disorder and might be bipolar because of her mood swings. *Id.* She stated that her mental health symptoms

began during her separation with her ex-husband. *Id.* She also claimed that the medication she takes for her mental health problems makes her drowsy for most of the day. (Tr. at 293-94.)

When asked about activities she is able to do around the house, Plaintiff replied that she does household chores, laundry, dishes, makes the bed, and sometimes drives. (Tr. at 294-95.) She also replied that she sometimes shops, but usually has someone go with her in case she has a panic attack. *Id.*

After finishing with his questioning, the ALJ gave Plaintiff's representative the opportunity to question Plaintiff. (Tr. at 298-300.) When asked about her panic episodes, Plaintiff testified that they occur three to four times per week, they can happen at any place, and her last attack occurred the night before the hearing. (Tr. at 298-99.) Plaintiff claimed that during an attack, her heart rate increased, she started crying, she got overwhelmed very easily, and she experienced chest pain and breathing problems. (Tr. at 299.) She stated that her panic episodes generally last approximately thirty to forty minutes or more. *Id.* She recalled that her last episode outside the house was three days before the hearing and occurred at a Wal-Mart store. (Tr. at 299-300.) Plaintiff testified that the episode began when she got mad at people in the store and started breathing hard and shaking. (Tr. at 300). She testified that she got upset and annoyed because people were standing in the middle of the little aisle and talking to each other or on their cell phones. *Id.* When asked, she acknowledged anger management problems. *Id.* Plaintiff testified that her panic attacks and her depression affected her ability to perform her old jobs. (Tr. at 301.) She claimed that the mental problems have totally changed her life and she is not as responsible as she used to be. *Id.* Additionally, she testified that she left her last three jobs because of panic attacks. *Id.* Plaintiff claimed that she has a hard time concentrating and has racing thoughts. (Tr. at 302.) She stated that

11

she sleeps approximately four hours per night because of the thoughts constantly running through her head.  (Tr. at 303.)

Plaintiff testified that even though medication helped, it has not eliminated all her symptoms. *Id.*  She also stated that she believes her condition has gotten a little worse in the last twelve to eighteen months because her depression has worsened as well as her feelings of uselessness.  (Tr. at 303-04.)  She admitted to having suicidal thoughts but denied ever acting on them.  (Tr. at 304.) Plaintiff was asked about her ability to function in a job, to which she responded that she did not think she could maintain and function in a full-time employment eight hours a day, five days a week. (Tr. at 304.)

After Plaintiff's representative finished his questioning, the ALJ asked Plaintiff whether she had used marijuana in the past.  (Tr. at 306.)  She testified that she began smoking marijuana during her fourth marriage.  (Tr. at 306-07.)  She also said that her doctors knew of her marijuana use while she was going through treatment, but explained to her that the marijuana use could counter the effects of the medication she was taking.  (Tr. at 308.)  She claimed to have stopped using marijuana about a month before the hearing.  *Id.*  Her explanation for the marijuana use was that it was an escape and would sometimes calm her down and help put her to sleep.  *Id.*

The ALJ asked Plaintiff about her living situation with her ex-husband.  (Tr. at 309.)  She stated that he was a negative influence on her and she only stayed with him because she did not have anywhere else to stay.  *Id.*

The ALJ then questioned the VE about Plaintiff's capacity to work.  (Tr. at 310-15.)  The vocational expert testified that it appeared that Plaintiff had held three significant jobs.  (Tr. at 313.) First, she had a job as a housekeeper/maid which he categorized as light; however, there were times

when the work exceeded the "light" category but not to the full range of medium, unskilled, SVP[5] of 2.  *Id.*  Second, she had a job as a janitor which he categorized as medium, unskilled, SVP of 2. *Id.*  Third, she had a job as a laundry laborer which he also categorized as medium, unskilled, SVP of 2.  *Id.*

The VE responded to a hypothetical question which assumed an individual of Plaintiff's age, education, and work experience who experienced a moderate level of anxiety, fatigue, and discomfort affecting her ability to work in a competitive environment.  (Tr. at 313-14.)  The hypothetical question also assumed that the individual could lift and carry objects up to twenty pounds, stand or sit with normal breaks for six hours in an eight-hour workday, and sit with normal breaks for a total of six hours in an eight-hour workday.  *Id.*  Additionally, the hypothetical stated that the individual could only occasionally stoop and should avoid even moderate exposure to machinery and heights.  *Id.*  The VE testified that the hypothetical individual could still perform the job of a housekeeper/maid.  (Tr. at 314.)

Next, Plaintiff's representative posed two hypothetical questions to the VE.  (Tr. at 314-15.) His first hypothetical incorporated the same individual described by the ALJ except that the individual also experienced anxiety disorder with panic attacks that resulted in the individual walking off the job two to three times per month on a consistent basis.  (Tr. at 314.)  The VE testified that this situation would eliminate the job of housekeeper/maid and would also  eliminate

---

[5]The Department of Labor's *Dictionary of Occupational Titles* defines SVP as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  *Surkand v. Barnhart*, No. 00-3175, 2001 WL 1518292, at *1 (E.D. La. November 28, 2001) (citation omitted).  The time needed is ranked on a scale from 1 to 9, with 9 representing the most time needed to learn a job.  *Id.*

and reduce the other jobs performed previously by the individual.  *Id.*  The representative then asked

another hypothetical question, incorporating the same individual described by the ALJ, except that

because of her mental impairments and the side effects of her medication, the individual's pace and

persistence were reduced by twenty to twenty-five percent in performing her job duties.  (Tr. at 314-

15.)  The VE responded to the hypothetical by stating that the person could not adequately perform

the prior jobs.  *Id.*

**C.     ALJ's Findings**

    The ALJ issued his decision denying benefits on February 19, 2004.  (Tr. at 15-22.)  In his

findings, the ALJ found that Plaintiff had agoraphobia, chest pain derivative, stomach pain, carpal

tunnel release in her right wrist, and bilateral patella femoral.  (Tr. at 16.)  The ALJ concluded that

the impairments were severe within the meaning of the Regulations, but not severe enough to meet

or medically equal any listed impairments.  (Tr. at 18-19.)  Specifically, the ALJ considered Listing

12.04 (affective mood disorder) and 1.02 (major dysfunction of a joint) and concluded that

Plaintiff's impairments met neither listing.  (Tr. at 19.)  The ALJ justified this conclusion by looking

at all relevant evidence.  In particular, he noted that Plaintiff had not been hospitalized for a mental

disorder and had not always been compliant with medication.  *Id.*  Also, Plaintiff had only mild

restrictions of activities of daily living, moderate difficulties in maintaining social functioning,

moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of

decompensation.  *Id.*  Additionally, Plaintiff retained the abilities to understand and carry out simple

instructions, to interact with coworkers and supervisors, and to adapt to routine changes in work

setting.  *Id.*  Finally, the ALJ noted that Plaintiff's motor strength was 5/5 in all groups and hand

grips were also 5/5, she had normal handling abilities with pain, and x-rays of her right hand and

14

knee were normal.  *Id.*

After reviewing all the relevant medical evidence from the record, the ALJ found that Plaintiff's subjective reports of functional limitations were not supported by the objective medical findings to the extent alleged.  (Tr. at 19-20.)  The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform the exertional demands of light work, or work that required lifting no more than twenty pounds at a time or carrying of objects weighing up to ten pounds.  (Tr. at 20.)  In reaching his conclusion, the ALJ considered the state agency medical consultant's opinions and generally agreed with them.  *Id.*  Also, the ALJ considered but did not agree with the social worker's opinions regarding Plaintiff's ability to work to support herself.  *Id.*  Because Plaintiff's past work as a housekeeper did not require the performance of work-related activities precluded by her RFC, the ALJ, based on the testimony on the vocational expert, found that Plaintiff could perform her past relevant work as a housekeeper.  (Tr. at 21.)  Therefore, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.  *Id.*

## II.  ANALYSIS

*A.*	***Legal Standards***

### 1.	<u>Standard of Review</u>

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id.*

## 2.   **Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant

is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    *Issues for Review*

Plaintiff alleges that substantial evidence does not support the Commissioner's finding that

17

she was not disabled because:

(1)     The ALJ's RFC assessment does not specifically account for the mental limitations reflected in his PRTF findings.

(2)     The ALJ failed to accord appropriate weight to the findings and opinions of Dr. Decena.

(3)     The ALJ failed to properly consider the opinions of the reviewing agency physicians.

(4)     The ALJ violated the Social Security Act by substituting his own opinions for medical opinion without making a reasonable effort to ensure that a qualified psychiatrist or psychologist reviewed the new mental health evidence received after the case was originally reviewed by the state agency.

(5)     The ALJ's RFC assessment is not supported by substantial evidence and is not based on consideration of all the impairments documented in the record.

(6)     The ALJ failed to perform a proper Step Four analysis.

**C.      Issue One: Mental Limitations in PRTF Findings Reflected in RFC**

Plaintiff asserts that the ALJ erred because his RFC assessment did not specifically account for the mental limitations reflected in his PRTF ("Psychiatric Review Technique Form") findings. (Pl.'s Br. at 12.)

Where the evidence shows that a claimant has a severe mental impairment, the ALJ must determine "if it meets or is equivalent in severity to a listed mental disorder."  20 C.F.R. § 416.920a(d)(2).  If the ALJ finds that the severe mental impairment "neither meets or is equivalent in severity to any listing," the ALJ will assess the claimant's RFC.  20 C.F.R. § 416.920a(d)(3).  The ALJ alone is responsible for determining a claimant's RFC.  *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).  When determining  mental RFC, the ALJ must make a more detailed assessment by itemizing the various functions contained in the PRTF.  *Ramirez v. Barnhart*, 372 F.3d 546, 551-52 (3rd Cir. 2004); *see also* SSR 96-8p.  If substantial evidence in the record supports an ALJ's

determination of a claimant's RFC, there is no error. *Gutierrez v. Barnhart*, No. 04-11025, 2005 WL 1994289, at *7 (5th Cir. Aug. 19, 2005).

In the present case, the ALJ's opinion reflects assessment of Plaintiff's PRTF, finding that Plaintiff had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 19.) The ALJ then found that Plaintiff had some severe impairments, but none that were of listing severity. (Tr. at 21.) Finally the ALJ found that Plaintiff retained the RFC to perform the exertional demands of light work. (Tr. at 20.) The ALJ's RFC analysis included a more detailed narrative of how the Plaintiff would be affected by her impairments stating that she could "occasionally stoop and should not work around machinery" and "will have a moderate level of anxiety, fatigue and discomfort." *Id.* This explanation given by the ALJ meets the requirements of SSR 96-8p and *Ramirez* because it went beyond the simple findings of the PRTF, which only give the ALJ the choice of checking from a number of boxes to express Plaintiff's mental limitations. 372 F.3d at 553. By stating that Plaintiff will have a "moderate level of anxiety, fatigue and discomfort," the ALJ incorporated the generic ratings in each of the four categories of the PRTF. (Tr. at 20.) Specifically, "anxiety" relates to both Plaintiff's moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace, "fatigue" relates to Plaintiff's moderate difficulties in maintaining concentration, persistence, or pace, and "discomfort" can be seen to relate to any of the PRTF categories. Also, since the ALJ found no episodes of decompensation, he did not have to include that in his RFC analysis.

For these reasons, the Court finds no error in the ALJ's RFC assessment.

19

**D.      *Issue Two: Findings and Opinions of Dr. Decena***

Plaintiff argues that the ALJ erred in failing to identify Dr. Decena as Plaintiff's treating

psychiatrist and failed to accord appropriate weight to his diagnoses and opinions.  (Pl.'s Br. at 13).

An ALJ is required to evaluate every medical opinion received and set forth the weight given

those opinions.  20 C.F.R. § 404.1527(d); *Newton*, 209 F.3d at 453.  "A treating physician's opinion

on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with . . . other substantial evidence.'"  *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir.

1995) (citing 20 C.F.R. § 404.1527(d)(2)).  However, if good cause exists, an ALJ may give a

treating physician's opinions little or no weight.  *Newton*, 209 F.3d at 455.  "Good cause may permit

an ALJ to discount the weight of a treating physician relative to other experts where the treating

physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or

diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 456.  Thus, "[t]he

treating physician's opinions are not conclusive."  *Id.* at 455.  "Even though the opinion and

diagnosis of a treating physician should be afforded considerable weight in determining disability,

'the ALJ has the sole responsibility for determining a claimant's disability status.'"  *Martinez*, 64

F.2d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  "[T]he ALJ is free to

reject the opinion of any physician when the evidence supports a contrary conclusion."  *Martinez*,

64 F.2d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

The Fifth Circuit in *Newton* held that "absent reliable medical evidence from a treating or

examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion

of the treating physician only if the ALJ performs a detailed analysis of the treating physician's

views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  209 F.3d at 455.  Thus, before

deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the

physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3)

the nature and extent of the treatment relationship; (4) the support of the physician's opinion

afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a

whole; and (6) the specialization of the treating physician.  *Newton*, 209 F.3d at 456 (citing 20

C.F.R. § 1527(d)(2)).  If the ALJ fails to consider the requisite criteria, the case must be remanded.

*Locke v. Massanari*, 285 F. Supp.2d 784, 795 (S.D. Tex. 2001).  However, the court expressly

excluded from the scope of *Newton* cases "where there is competing first-hand medical evidence and

the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" and

cases in which "the ALJ weighs the treating physician's opinion on disability against the medical

opinion of other physicians who have treated or examined the claimant and have specific medical

bases for a contrary opinion."  *Newton*, 209 F.3d at 458.  Thus, "*Newton* is limited to circumstances

where the administrative law judge summarily rejects the opinions of a claimant's treating physician,

based only on the testimony of a non-specialty medical expert who had not examined the claimant."

*Contreras v. Massanari*, No. CIVA 1:00CV242C, 2001 WL 520815, at *4 (N.D. Tex. May 14,

2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, No. Civ.A.SA-020CA0752XR, 2003

WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003).

     Plaintiff's reliance on *Newton* and *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir.

2003), for the proposition that an ALJ must explain in each written decision the weight given to

treating physicians and consider each factor set forth in 20 C.F.R. § 404.1527(d) is not supported

by case law.  *See Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 509 (S.D. Tex 2005) (noting that the

holding in *Newton* was limited to certain circumstances).   As stated above, *Newton's* holding is limited to situations where "the administrative law judge summarily rejects the opinions of the claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the plaintiff." *Contreras*, 2001 WL 520815, at *4.  *Watkins* also was a case where the ALJ specifically rejected the opinion of the claimant's treating physician without further explanation.  *Watkins*, 350 F.3d 1299-1300.  In the instant case, the ALJ did not summarily reject the findings and opinions of Dr. Decena.  Although the ALJ's findings do not specifically mention Dr. Decena by name, the findings do discuss in detail the treatment and diagnosis Plaintiff received at Helen Farabee Regional MHMR Center.  (Tr. at18).  Since the record indicates that Dr. Decena was Plaintiff's only treating physician at Helen Farabee MHMR, it is clear that the ALJ considered his opinions.  (264-75).  Additionally, there is no indication in the decision that the ALJ rejected those opinions or determined that they were entitled to less weight.

For these reasons, the Court finds that the ALJ properly accorded appropriate weight to the diagnosis and opinions of Dr. Decena.

**E.     *Issue Three: Opinions of Reviewing Agency Physicians***

Plaintiff claims that the ALJ erred in failing to properly consider and explain the wight given the opinions of the reviewing State agency physicians.  (Pl.'s Br. at 14).

Although ALJs "are not bound by any findings made by State agency medical psychological consultants," they must consider such findings as opinion evidence. 20 C.F.R. §§ 404.1527(f)(2)(I), 416.927(f)(2)(I).  An ALJ may not ignore the opinions of State agency medical consultants and must explain the weight given those opinions in their decision.  SSR 96-6p.  However, even where the record demonstrates procedural improprieties, a court will not remand unless the substantial rights

of a party have been affected. *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).  Remand is appropriate only if the improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision. *Id.*

In this case the ALJ did not ignore the opinions of State medical consultants, nor did he fail to explain the weight given those opinions.  The ALJ's decision specifically discussed both Dr. Alexander and Dr. Boulos' assessments as well as other State medical consultants' assessments conducted in April and July 2002. (Tr. at 17.)  The ALJ's findings were wholly consistent with the opinions of all the State medical consultants' opinions.  (Tr. at 17, 19.)  Specifically, both the ALJ and the consultants found that Plaintiff had "mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation." *Id.*  Furthermore, both the ALJ and the consultants found that Plaintiff "retain[ed] the abilities to understand and carry out simple instructions, to interact with coworkers and supervisors and to adapt to routine changes in work setting." (Tr. at 19.)

Additionally, in setting forth Plaintiff's RFC, the ALJ stated that he had "considered the determinations made by the State agency medical consultants," and "generally agree[d] with the determinations made by [them]." (Tr. at 20.) Although the statement that he "generally agreed with the determinations" does not clearly indicate the amount of weight given to the State consultants' opinions, the record indicates that the ALJ did not reject any portion of their opinions.  (Tr. at 16-22).  In fact, the ALJ's decision reflects all the State consultants' opinions which would have been beneficial to Plaintiff's case, and therefore any procedural error that might have occurred could not have prejudiced the Plaintiff.  (Tr. at 18-19).  The ALJ's decision also reflects State consultants'

opinions that are harmful to the Plaintiff's case, including the opinion that Plaintiff's alleged impairments were not fully supported by the record.  Accordingly, the Court finds that the ALJ properly considered the opinions of State agency medical consultants in reaching his conclusion that Plaintiff is not disabled.

**F.**      ***Issue Four: ALJ's Duty to Fully and Fairly Develop the Record***

The Plaintiff argues that the ALJ erred by not making a reasonable effort to ensure that a qualified psychiatrist or psychologist reviewed Dr. Decena's medical reports.  (Pl.'s Br. at 15).  The Plaintiff specifically claims that the ALJ should have either gotten medical expert testimony or referred the case back to the agency.  *Id.*

The ALJ has a duty to fully and fairly develop the facts relevant to a claim for benefits. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).  However, an ALJ is not required to obtain the testimony of a medical expert ("ME").  20 C.F.R. § 404.1527(f)(2)(iii) ("[ALJs] *may* also ask for and consider opinions from medical experts.") (emphasis added).  Failure to develop an adequate record is not *per se* grounds for reversal.  *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984). Plaintiff must show that she "could and would have adduced evidence that might have altered the result."  *Carey*, 230 F.3d at 142.

Here, the ALJ fully developed the record from which to make a decision regarding Plaintiff's alleged disability.  The ALJ had a voluminous record of Plaintiff's medical history including Dr. Decena's treatment records and opinions.  Furthermore, because the ALJ has the discretion to obtain the services of a medical expert and is not required to do so, it was not an error for him to fail to call a medical expert during the hearing.  Additionally, Plaintiff has not shown how any additional evidence regarding Dr. Decena's medical reports would have altered the outcome of the case.

For these reasons, the Court finds no error in the ALJ's failure to call an ME to testify at the hearing or refer the case back to the agency to review Dr. Decena's reports.

**G.      *Issue Five: Consideration of All Impairments Documented in the Record***

Plaintiff argues that the ALJ's RFC analysis is not supported by substantial evidence because Plaintiff suffers from hand impairments stemming from either physical or emotional causes which limit her ability to perform manipulative activities such as housekeeping.  (Pl.'s Br. at 16).

The question before this Court is not whether evidence in the record would support a different decision, but whether substantial evidence in the record supports the ALJ's decision not to include a manipulative limitation in his RFC finding.  *See Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) (holding that a court may not "reweigh the evidence or substitute [its] judgment for the [Commissioner's]," but must "scrutinize the record in its entirety to determine whether substantial evidence does indeed support the [Commissioner's] findings");  *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."); *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996) ("We must consider both evidence that supports and evidence that detracts from the [Commissioner's] decision, but we may not reverse merely because substantial evidence exists for the opposite decision.").

Although Dr. Panjwani's impression was that Plaintiff was still symptomatic from carpal tunnel syndrome and was "unable to perform activities like doing housekeeping work like she used to do before," there is ample evidence in the record that supports the ALJ's decision not to include manipulative impairments in Plaintiff's RFC.  (Tr. at 189.)  For instance, Plaintiff admitted that she

25

is able to make the bed, do some household chores, do laundry, and do dishes.  (Tr. at 294).

Additionally, Dr. Sundin, a consultative examiner, evaluated Plaintiff's manipulative limitations and

concluded that she had only occasional handling and fingering limitations when using her right hand.

(Tr. at 196.)  He also concluded that her motor strength and hand grip were 5/5 in all groups tested,

she had normal handling ability with pain, and x-rays were normal of right hand.  (Tr. at 195.)

Furthermore, Dr. Panjwani's opinion was not completely consistent on the issue of manipulative

limitations, because it included the finding that Plaintiff's "hand grip [was] 5/5, normal, and

symmetric," and her "[f]ine finger movements [were] normal and [she] had the ability to handle

small objects and button buttons on clothing."  (Tr. at 187.)

For the reasons set forth above, the Court concludes that substantial evidence indeed supports

the ALJ's RFC finding.

## H.    Issue Six: Step Four Analysis

Finally, Plaintiff argues that the ALJ's failed to perform a proper Step Four analysis.  (Pl.'s

Br. at 16.)  It appears that Plaintiff is raising two distinct issue within this argument.  First, she

argues that the hypothetical posed to the vocational expert did not reflect all Plaintiff's impairments

and limitations as set forth in the record.  Second, she argues that the ALJ failed to make any

findings regarding the physical and mental demands of Plaintiff's past relevant work.  *Id.*

### 1.    Hypothetical question

Plaintiff first argues that the ALJ erred in posing a hypothetical question to the VE because

the question did not accurately reflect all of Plaintiff's impairments.  (Pl.'s Br. at 16.)

The ALJ relies on the medical-vocational guidelines or the testimony of a VE in response

to a hypothetical question to establish that work exists for a claimant.  *Bowling v. Shalala*, 36 F.3d

431, 435 (5th Cir. 1994).   A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ, and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question.  *Bowling*, 36 F.3d at 436; *Morris v. Bowen*, 864 F.2d 333,  336 (5th Cir. 1988).  The Fifth Circuit's test for an erroneous hypothetical is "unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonable all disabilities of the claimant *recognized by the ALJ*, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical question...a determination of non-disability based on such a defective question cannot stand." *Bowling*, 36 F.3d at 436 (emphasis added).  Plaintiff's reliance on *Boyd v. Apefel*, 239 F.3d 698 (5th Cir. 2001) is misplaced because, contrary to Plaintiff's argument, the holding in that case did not alter the Fifth Circuit's test for a defective hypothetical question.  The case merely held that an ALJ must take into account post-hearing evidence.  *Id.*  Here, the hypothetical question included the RFC finding that the Plaintiff "experiences a moderate level of anxiety, fatigue and discomfort effecting her ability to work in a competitive environment."  (Tr. at 314).  As stated above, the ALJ's RFC was supported by substantial evidence and therefore his hypothetical which included all the limitations he found from the record was not erroneous.  Furthermore, Plaintiff's representative was afforded an opportunity to correct any deficiencies that Plaintiff thought were present in the ALJ's hypothetical and asked two follow-up  hypothetical questions to the vocational expert.  (Tr. at 314-15).  Since the ALJ's hypothetical question satisfied the two requirements set by the Fifth Circuit for hypothetical questions posed to vocational experts, Plaintiff's argument fails.

2.      Findings related to Plaintiff's past work

Next, Plaintiff argues that the ALJ failed to make any findings regarding the physical and mental demands of Plaintiff's past relevant work.  (Pl.'s Br. at 16.)

"[I]n finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact: (1) A finding of fact as to the individual's RFC (2) A finding of fact as to the physical and mental demands of the past job/occupation (3) A finding of fact that the individual's RFC would permit a return to his or her past job or occupation."  SSR 82-62.  The ALJ can either look to the job duties peculiar to an individual job as the Plaintiff actually performed it or look to the job demands and duties as ordinarily performed in the national economy.  SSR 82-61.  Also, there is no requirement that the ALJ obtain VE testimony when finding a claimant can perform past relevant work, although there are some instances where it is "a good idea to do so."  *Atkins v. Apfel*, No. Civ.A. 99-3874, 2000 WL 1335820, at *3 (E.D. La. September 14, 2000).

The ALJ in the instant case did not make any findings regarding the mental demands of Plaintiff's past job as a housekeeper.  However, the ALJ ultimately concluded that the Plaintiff could perform her past relevant work as a housekeeper/maid.  (Tr. at 21.)  In making this decision he relied solely on the VE's testimony that the Plaintiff could still perform work as a housekeeper/maid.  *Id.* When asked to describe the past relevant work performed by the Plaintiff, the VE stated that "there appears to be three significant jobs.  The first would be that of housekeeper/maid, a light.  There are times there may have been exceeded but not to a full range of medium, unskilled, SVP of 2.  The job of janitor, medium, SVP of 2, also unskilled.  And the job of laundry laborer, medium, unskilled, SVP of 2."  (Tr. at 313.)  None of these past relevant work job descriptions provided by the

28

vocational expert established the mental demands of Plaintiff's job as a housekeeper/maid, as required by SSR 82-62. *Id.* Furthermore, there is no other evidence in the record which establishes any mental demands of Plaintiff's previous housekeeper/maid job.  During the hearing, the ALJ never inquired as to the mental demands that the Plaintiff had in her job as a housekeeper/maid.  Also, it does not appear that the ALJ looked to the demands of the Plaintiff's past relevant work as ordinarily performed in the national economy.  Therefore, this Court concludes that the ALJ's Step Four analysis was incomplete, and remand is necessary.

### III.  CONCLUSION

For the foregoing reasons, Plaintiff's *Motion for Summary Judgment* is **GRANTED**, *Commissioner's Cross-Motion for Summary Judgment* is **DENIED**, and the decision of the Commissioner is **REVERSED** and the case be **REMANDED** for reconsideration.

Furthermore, on remand the ALJ must, as a part of his Step Four analysis, assess Plaintiff's past employment as a housekeeper/maid and make specific findings as to the mental demands of the work.  If the ALJ determines that Plaintiff is unable to perform the duties of her past relevant work as a housekeeper/maid, the ALJ should proceed to Step Five and obtain the opinion of a vocational expert.

**SO ORDERED**, this 31st day of July, 2006.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE